# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 50270 | **DATE** | 1/19/2011 |
| **CASE TITLE** | Cars R Us Sales and Rentals, Inc., et al. vs. Ford Motor Company | | |

**DOCKET ENTRY TEXT:**

For the reasons stated below, defendant's motion for summary judgment is granted. Judgment is entered in favor of defendant and against plaintiffs. This case is terminated.

*Philip G. Reinhard*

■ [ For further details see text below.]

Electronic Notices.

## STATEMENT - OPINION

Plaintiffs, Cars R Us Sales and Rentals, Inc., an Illinois corporation with its principal place of business in Illinois ("Cars"), Michael Beggin, a citizen of Illinois, and General Casualty Insurance Company, a Wisconsin corporation with its principal place of business in Wisconsin ("General"), bring this negligence action against defendant, Ford Motor Company, a Delaware corporation with its principal place of business in Michigan. Complete diversity of citizenship exists and the amount in controversy exceeds $75,000, so this court has jurisdiction of this matter. 28 U.S.C. § 1332 (a) (1). Defendant moves for summary judgment.

Plaintiffs claim defendant negligently designed and manufactured a certain 1997 Ford Escort ("Escort") such that it caught fire on February 24, 2005, and damaged real, personal, and business property owned by Cars and Beggin and insured by General. Plaintiffs also claim defendant failed to give adequate warnings as to the dangers posed by the negligently designed and manufactured vehicle. The Escort came factory-equipped with an airbag, an integrated airbag module ("IABM") and airbag control module ("ACM"). A recall notice dated December 6, 2002, was issued by defendant and the National Highway Traffic Safety Administration ("NHTSA") for 1997 Ford Escorts due to an issue involving water or other liquid contaminants falling on the IABM. The contaminants can cause shorting and possible fire in the vehicle. Though the Escort was subject to this recall, the recall work was never performed on this vehicle prior to the fire.

In May 2004, Beggin, the owner of Cars, purchased the Escort at an auction in Florida. A mechanic at Cars serviced the Escort for safety before Cars offered it for sale on its car lot. The Escort was given a 27-point safety inspection but that inspection did not include checking either the NHTSA or defendant's website to determine whether any safety recalls were applicable to the Escort. The Escort was sold on or about May 22, 2004 and repossessed in September 2004. The Escort was serviced at that time by Cars and again on November 8, 2004. No check for outstanding safety recalls was performed either time. In February 2005, the Escort was sold to Lynda Faragher. No investigation was undertaken by any Cars employee to determine whether the Escort was subject to a recall at the time of the sale.

Several days after buying the Escort, Faragher noticed that a red light turned on while she was driving and she brought the Escort back to Cars to be serviced. Two days before the fire, Faragher again noticed a warning light flashing on her dashboard. On the day of the fire, on her way back to Cars for service, the Escort stalled and was

towed to Cars. Faragher told the truck driver of an electrical burning smell coming from the vehicle. The car sat outside for 30 minutes to one hour and was then pushed into the Cars shop. Approximately 20 minutes later, it caught fire. Witnesses observed fire at the center of the windshield/dash area, above the IABM.

Beth Anderson is an electrical engineer retained by plaintiff as an expert witness. Her opinion is that the fire was caused by arcing on the conductors attached to the IABM. Anderson was deposed on February 18, 2010. Anderson is not an automotive engineer and testified she is not familiar with the standards and policies followed by automotive or motor vehicle manufacturers or component suppliers. She has not designed any airbag or restraint system component. In her deposition, she testified that she did not know what practices defendant followed from a design, manufacture, or assembly standpoint that led to this condition in the IABM, that she did not have any knowledge of what other automotive manufacturers may do differently with respect to the design, manufacture, or assembly of airbag systems, and that based on that lack of knowledge concerning defendant's and other manufacturers' practices that she was not in any position to say whether defendant was or was not negligent with respect to the design or manufacture of the IABM included in the Escort.

Subsequent to her deposition, Anderson completed a supplemental opinion report in which she offered the opinion that to a reasonable degree of engineering certainty the fire was caused by a design defect that allowed moisture to come in contact with the energized electrical conductors of the IABM during normal operation of the vehicle allowing arcing to occur that ignited the combustible materials near the IABM and that this was negligent because defendant failed to use ordinary care in the design and manufacture of the vehicle because it knew or should have known this design defect was unreasonably dangerous. This supplemental opinion report was based on a review of documents produced by defendant on the date of Anderson's deposition. She formulated her opinion from her review of these documents in conjunction with her earlier investigation. The documents reviewed for the supplemental opinion included: six engineering drawings (though one was not viewable and a second was only partially scanned on the copy of the CD Anderson reviewed) related to the IABM wiring harness and connectors, eight pages of a Mazda Engineering Specification regarding connector labeling, a 1997 Ford Escort Owner's Guide, a 1997 Ford Escort Maintenance Schedule, a list of the Field Service Actions for the 1997 Ford Escort, a list of Technical Service Bulletins for the 1997 Ford Escort, a 1997-Model Warranty Guide, warranty records for the Escort which is the subject of this suit, The Worldwide Design Requirement for Body/Interior Occupant Protection, 996 pages of customer contact records, 17 pages of technical contact records, a copy of the Mini 999 equivalent factory invoice and a list of lawsuits and non-litigated claims received as of 12/31/2008 that allege non-collision fires associated with the electrical wiring in the 1997 Ford Escort airbag module. Defendant challenges the admissibility of this supplemental report and the opinions therein.

"To establish liability on a theory of negligent design, a plaintiff must show duty, breach, proximate cause, and damages." Malen v. MTD Products, Inc., No. 08-3855, 2010 WL 4670176, *10 (7th Cir. Nov. 19, 2010). "A design defect is established by evidence of a practical, cost-effective alternative that was technologically feasible and would have prevented [the] injury." Id. "[I]n addition to showing that the product was defective, the plaintiff must show that the manufacturer knew (or should have known) that the product was unsafe." Id. "[T]he plaintiff must provide some evidence that the manufacturer: (1) deviated from the standard of care that other manufacturers in the industry followed at the time the product was designed or (2) knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and that it failed to warn of the product's dangerous propensity." Salerno v. Innovative Surveillance Tech., Inc., 932 N.E.2d 101, 111-12 (Ill. App. 2010). "Because products liability actions involve specialized knowledge, the plaintiff must provide expert testimony on the standard of care and a deviation from that standard to establish either of these propositions." Id., at 112. Defendant argues plaintiffs fail to present adequate expert testimony to establish the standard of care, a deviation from that standard or that defendant knew or should have known the product was unreasonably dangerous.

Based on their responses to defendants statement of facts, plaintiffs admit that during her deposition Anderson testified she was not in a position to say whether defendant was negligent or not in the design or manufacture of the IABM. She did not know what other manufacturers did in the design and manufacture of IABMs. In preparing her supplemental report, she reviewed engineering drawings of defendant related to the IABM wiring harness and connectors and eight pages of a Mazda Engineering Specification regarding connector labeling. She notes in her supplemental report that the Mazda specification "on connector symbols indicates how a watertight connector should be labeled" and that the defendants engineering drawings "contain no such label." She notes that the Mazda

specifications "on connector symbols indicates that watertight connectors do exist in automobiles" and that defendant's "engineering drawings require the use of a grease pack in the connector."

The supplemental report does not adequately establish the standard of care in the industry. Other than the two references to the Mazda engineering specifications concerning labeling connectors, the report makes no reference to other automakers at all. The references to the Mazda specifications do not establish a standard of care. The most Anderson can draw from these is that watertight connectors do exist in automobiles. There is no evidence of how any manufacturer avoids the problem of arcing which she opines caused the fire in the Escort. Plaintiffs fail to establish an industry standard of care and, therefore, necessarily fail to establish defendant breached an industry standard. See id.

Plaintiffs claim that, even if evidence of a deviation from a standard of care followed by other manufacturers at the time the product was designed is absent, they have still established a basis for defendant's liability because they have presented evidence that defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and that defendant failed to warn of the products dangerous propensities. Id. at 111-12. They rely on Anderson's opinion that the location of the IABM exposed it to possible moisture intrusion and/or contamination and that defendant knew or should have known this design defect was unreasonably dangerous.

In Navarro v. Fuji Heavy Industries, Ltd., 117 F.3d 1027 (7th Cir. 1997), on very similar facts, the court held the defendant was entitled to summary judgment. The Navarro plaintiff was injured when the rear suspension of the 1982 Subaru she was riding in suddenly and unexpectedly gave way as a result of having rusted through. The plaintiff claimed the defendant was negligent in designing the car's rear suspension in such a way that it might rust through from the inside out so there would be no visible clue that the suspension was about to give way. Two years prior to the accident a notice of recall identifying this problem had been issued. To prove negligence, the plaintiff submitted the affidavit of an engineer and the recall notice. The engineer, an experienced consultant in the relevant fields of failure analysis, mechanical safety, and accident reconstruction, inspected the vehicle and concluded the accident was caused by the "insidious corrosion of the rear suspension" which the court held was properly admissible. Navarro, 117 F.3d at 1031. The court stated "[t]he affidavit goes on to state that 'prior to 1981 [the date of manufacture] Fuji Heavy Industries knew of the corrosive effects of road salt on the suspension arms of a vehicle'- but this amounts to nothing more than the truism that a manufacturer of a steel product is charged with elementary knowledge that salt is corrosive." Id. The court continued, "[w]ith little more ado the expert concluded that 'the design and manufacture of the rear suspension arm in 1981 was negligent and unreasonable.' The affidavit contains no support for this conclusion." Id. "[A]t most the affidavit is evidence that Fuji should have known back in 1981 that its rear suspension might rust through in highly corrosive driving environments. There is no indication that responsible engineers at the time thought the hazard considerable because undetectable, and therefore worth guarding against and if so by what means, or that Fuji could have redesigned the suspension to avoid the hazard at a cost commensurate with the expected accident cost, which might reasonably have seemed slight-or indeed at any cost." Id. The affidavit did not state what other automobile manufacturers were doing about corrosion in 1981. Id. The court observed "[t]he recall notice adds nothing to the affidavit. It merely shows that in 1990 (for there is no indication that Fuji discovered the problem earlier and sat on it) Fuji discovered the problem of the undetectable rusting." Id. at 1032. "When the inadmissible, because nakedly conclusional, portions of the expert's affidavit are stricken, there just is no evidence, though there may be a common-sense suspicion, that the 1982 Subaru's rear suspension was defective." Id.

Here, Anderson testified in her deposition that she was not in a position, based on her lack of knowledge of what practices defendant followed or what practices other manufacturers followed, to say whether defendant was negligent. Her supplemental opinion that defendant was negligent necessarily arises from what she reviewed after that deposition. Anderson's review of the recall notice, list of Field Service Actions, Technical Service Bulletins, customer contact and technical contact records, and list of lawsuits and non-litigated claims add little to resolving the issue since they all deal with matters occurring after the design and manufacture of the Escort. See id. The question is what defendant knew or should have known at the time of design and manufacture not what it learned later.

The crux of Anderson's opinion that the design is negligent is based on the engineering drawings. The IABM was physically located below the air conditioner evaporator core housing and the heater core housing. She states wiring harnesses in the area provide a moisture path for condensate. The air conditioner evaporator provides a cool surface on the housing when the evaporator is in operation and moisture in the air will condense on the surface of the housing of any surface that offers a cooler temperature than the air. Anderson states that energized conductors should be protected from moisture and other contaminants in order to ensure safe operation of an electrical circuit. The

| STATEMENT - OPINION |
|---|

IABM was not shielded against moisture intrusion, the connectors to the IABM were not watertight, and one of the electrical feeds to the IABM was designed to be always hot and the other to be hot when the key was in the Run or Start position. She concludes the location of the unprotected electrical connectors under the heater core is a negligent design. Heater core leaks and condensation were causes of moisture related failures in the IABM. Anderson states the design allowed moisture to come into contact with the energized electrical conductors of the IABM during normal operation of the vehicle and the moisture intrusion allowed arcing to occur which ignited combustible materials near the IABM. She opines defendant knew or should have known this was unreasonably dangerous.

     Nothing in the evidence presented by plaintiffs shows defendant knew the particular configuration of the air conditioner evaporator housing, heater core housing, and IABM posed a fire hazard. Should it have known? As in Navarro, where the court noted that the expert's affidavit may have been "evidence that Fuji should have known back in 1981 that its rear suspension might rust through in highly corrosive weather conditions," id., Anderson's supplemental opinion might show defendant should have known that condensate might collect on the air conditioner evaporator housing, or the heater core housing might leak, and that either of these might cause dripping onto the IABM. But "[t]here is no indication responsible engineers at the time thought the hazard considerable." Id. at 1031. Anderson's supplemental opinion does not show how her conclusion that defendant should have designed the vehicle differently "is grounded in - follows from - an expert study of the problem." Id. at 1032. Anderson's opinion that defendant's design was negligent is not sufficiently supported to meet the Daubert standard for admission of expert testimony. See id. at 1031-32. Her opinion, therefore, cannot be considered on this point and, accordingly, plaintiffs have not established that in the exercise of ordinary care defendant should have known the chosen design was unreasonably dangerous.

     Because plaintiffs have not established defendant knew or should have known of an unreasonably dangerous condition, it follows defendant had no duty to warn of such a condition.

     Defendant also argues the contributory negligence of Cars in not checking for recall notices and not having the recall work performed entitles defendant to summary judgment. Because the court finds plaintiffs have not submitted evidence, specifically expert testimony, that would establish negligence by defendant, the court need not reach the contributory negligence question.

     For the foregoing reasons, defendant's motion for summary judgment is granted. Judgment is entered in favor of defendant and against plaintiffs. This case is terminated.